[No. E005276. Fourth Dist., Div. Two. Mar. 21, 1990.]

THE PEOPLE et al., Plaintiffs and Respondents, v.
DAVID VAN HORN et al., Defendants and Appellants.

1380

## COUNSEL

Butterwick, Babcock, Cappelli & Bright and J. D. Butterwick for Defendants and Appellants.

Cameron & Hoffman and Ronald Brooks Cameron as Amici Curiae on behalf of Defendants and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and Manuel M. Medeiros, Deputy Attorneys General, for Plaintiffs and Respondents.

## OPINION

McDANIEL, J.—In an action by the Attorney General of the State of California (the State) and the State of California's Native American Heritage Commission (the Commission) against defendants David Van Horn and Archaeological Associates, Ltd., seeking to recover possession of "Native American artifacts . . . taken from a Native American grave" (Pub. Resources Code, § 5097.99, subd. (a)),[1] defendants have appealed from a summary judgment in favor of plaintiffs which judgment granted plaintiff's application for a permanent mandatory injunction requiring defendants to surrender possession of certain artifacts. In our view, the trial court rightly granted the motion for summary judgment, and so we shall affirm.

### BACKGROUND

As reflected by the pleadings, along with the several filings in support of and in opposition to the State's motion for summary judgment, the following events led to this litigation. The City of Vista hired Archaeological Associates, Ltd., to conduct an archaeological survey on private property which the city planned to acquire for use as an industrial park. David Van Horn is an archaeologist who is an employee and vice-president of Archaeological Associates, and who resides in Sun City. The president of Archaeological Associates is Ruth Van Horn, David's wife. The survey was to be conducted to develop data for part of an environmental impact report on the environmental consequence of the proposed development of the property. During the survey, David Van Horn (Van Horn) uncovered an ancient grave dating from precolonial times and containing the skeletons of two males. One of the skeletons had an 80-pound metate (millstone) fragment on his chest; the other skeleton had a 30-pound metate fragment and another rock on his chest.

Van Horn contacted the county coroner, as required by Health and Safety Code section 7050.5, subdivision (b). Under subdivision (c) of that section, if the coroner has reason to believe that the human remains are those of a "Native American," he or she is required to telephone the Commission, a nine-member state agency, within twenty-four hours. Thereupon,

---

[1] At the time the complaint was filed, section 5097.99 recited in its entirety: "No person shall obtain or possess any Native American artifacts or human remains which are taken from a Native American grave or cairn on or after January 1, 1984, except as otherwise provided by law or in accordance with an agreement reached pursuant to subdivision (1) of Section 5097.94 [agreement between landowners and Indians] or pursuant to the provisions of Section 5097.98 [descendents may recommend 'the scientific removal and nondestructive analysis of human remains and items associated with North American burials']." In 1987, section 5097.99 was amended to provide that knowingly or willfully to obtain or possess such artifacts or remains is a felony.

per section 5097.98 of the Public Resources Code, the Commission is required to notify "those persons it believes to be most likely descended from the deceased Native American," in order that the descendents may recommend the disposition of the remains "and any associated grave goods." This section further requires, if the Commission cannot identify a descendent, or if the identified descendent fails to make a recommendation, that "the landowner or his or her authorized representative shall reinter the human remains and items associated with Native American burials with appropriate dignity on the property. . . ." (Pub. Resources Code, § 5097.98, subd. (b); unless otherwise noted, all further statutory references will be to the Public Resources Code.)

In the case here, however, after Van Horn contacted the coroner, the coroner mistakenly called the Bureau of Indian Affairs instead of the Commission. The coroner otherwise instructed Van Horn to *excavate the remains* and to place them in the custody of the San Diego Museum of Man. Van Horn did so, and the remains were examined by the museum's curator of physical anthropology, Rose Tyson. Tyson concluded that one of the skulls had features which were characteristic of inhabitants of a particular area of Baja California. Otherwise, the metates were removed from the grave by Van Horn and were taken by him to Archaeological Associates' laboratory in Sun City.

Sometime thereafter, the Oceanside Blade-Tribune reported the discovery, and apparently implied that Van Horn had attempted to conceal it from the public. (The newspaper articles are not in the record.) After several Indian groups in northern San Diego County had learned of the discovery, a meeting was held which included a representative of the city, a representative of the local Luiseno Tribe of Mission Indians (Henry Rodriguez), and Van Horn. At the meeting, it was agreed that the remains would be taken from the museum and reburied at the site where they had been found; however, the metates were not discussed at the meeting.

Shortly afterwards, a second meeting was held. That meeting included a representative from the museum, Van Horn, Rodriguez, and two members of the group inhabiting the Pechanga Indian Reservation, one of whom, Vincent Ibanez, is also a member of the Commission. Ibanez asked Van Horn to give up the metates in order that they could be reburied with the remains. Van Horn refused to do so, asserting, in his view, that it would be unethical to contribute to the loss of an archaeological collection which had been gathered at considerable expense to the public; that it was not certain that the remains were those of California Indians, and that the Indian claims to the metates were based on race rather than kinship or culture.

Then, about a year after the remains had been discovered, the State and the Commission (hereinafter referred to collectively as the State) filed the underlying action for injunctive relief against Van Horn and Archaeological Associates (defendants).

## SYNOPSIS OF TRIAL COURT PROCEEDINGS

In the complaint, the State alleged that defendants had possession of the metates; that defendants' continued possession of the metates was in violation of section 5097.99, and that defendants should be compelled to return the metates to the landowners.

Van Horn and Archaeological Associates, each acting in propria persona, filed separate answers to the complaint. Van Horn alleged in his answer that he was not in violation of section 5097.99 because he had never been in possession of the "artifacts," and that the artifacts were in the sole possession of Archaeological Associates. Van Horn also alleged that he was a member of the Society of Professional Archaeologists, and that the society's code of ethics required him actively to support conservation of the archaeological resource base.

Archaeological Associates alleged in its answer that it was not in violation of section 5097.99 because it was not certain that the grave was Native American, and that the artifacts were not "associated grave goods" within the meaning of section 5097.94, subdivision (k) (covering agreements between landowners and descendents regarding disposition of Native American remains and associated grave goods).

Archaeological Associates also filed a cross-complaint for injunctive relief against the State and the landowners. In the cross-complaint, Archaeological Associates alleged that the Commission and the landowners' decision to rebury the remains and the artifacts was in violation of Health and Safety Code section 7054 (disposal of human remains in any place other than a cemetery a misdemeanor), and that the Commission and the landowners should be restrained from burying the remains and the artifacts in any place which was not a cemetery.

The State answered the cross-complaint, denying its allegations, and requesting expenses and attorney's fees on the grounds that the cross-complaint was frivolous and intended solely to cause unnecessary delay. Apparently no disposition has been made of the issues raised by the cross-complaint and the answer thereto.

After it had filed its answer and cross-complaint, Archaeological Associates, now represented by an attorney, filed an amended answer to the

complaint, denying its allegations and raising two affirmative defenses. The first affirmative defense alleged that the Commission had no jurisdiction to direct the reburial of the metates, because, among other things, it had never determined whether the metates constituted "items associated with Native American burials" (§ 5097.94, subds. (k), (*l* )), or "associated grave goods" (§ 5097.94, subd. (k)). The second affirmative defense raised several constitutional objections to sections 5097.9 through 5097.99 relating to Native American historical cultural and sacred sites (see *post*).

About a year later, the State noticed a motion for summary judgment and for an order imposing sanctions pursuant to Code of Civil Procedure section 128.5, the latter on the ground that defendants had engaged in frivolous and dilatory tactics. The motion included a statement of undisputed facts which recited, in relevant part:

"2. Defendant Archaeological Associates, Ltd. . . . is presently in possession of two metates or metate fragments which were taken from a grave after January 1, 1984.

"3. The grave from which the aforesaid metates were taken was the grave of two members of the aboriginal peoples of North America, including the area now known as Baja California.

"4. Defendant Van Horn has exercised dominion and control over the aforesaid metates, with the knowledge and acquiescence of defendant Associates, by refusing to return them to the owners of the land from which they were taken, after demand by plaintiff Attorney General and others.

"[5.] Defendants do not allege any provision of law authorizing their retention of the metates; they do not allege that their continued possession of the metates is in accordance with an agreement entered into pursuant to subdivision (*l*) of Public Resources Code section 5097.94; and they do not allege that their retention of the metates is pursuant to section 5097.98 of the Public Resources Code."

The State's motion was supported by, among other things, Archaeological Associates' answers to the State's interrogatories, and several declarations of a deputy attorney general. In its answer to the State's interrogatories as to whether it contended that there was a distinction between the terms "Indian" and "Native American," and, if it did so contend, to state the nature of the distinction, Archaeological Associates stated that it contended there was a distinction between the two terms, and that the distinction was that " 'Indian,' when used as a noun, means a member of any of the aboriginal peoples of the western hemisphere. . . . 'Native American,' when used as a noun, means any individual who is a citizen of the United

States and who is a descendent of aboriginal peoples whose tribal territory is located within the boundaries of the continental United States."

In one of his declarations, the deputy attorney general representing the State stated that Van Horn had told him it was an " 'open question' " as to whether the metates were grave goods, and that he, Van Horn, personally felt that the metates had been placed on the chests of the skeletons not as grave goods, but simply to weigh the bodies down.

Archaeological Associates filed opposition to the State's motion for summary judgment. The opposition included a separate statement in response to the State's statement of undisputed material facts. Responding to the earlier statement, the opposition statement recited, in relevant part:

"2. [Responding to the statement that Archaeological Associates was in possession of metates taken from a grave:] Defendant agrees it has possession of metate fragments but disagrees that the same were taken from a 'grave' as that term is defined by statute.

"3. [Responding to the statement that the grave was that of two members of the aboriginal peoples of North America:] Defendant agrees except for its reservations, set forth in paragraph 2 above, concerning the term 'grave.'

"4. [Responding to the statement that Van Horn had exercised dominion and control over the metates, with the knowledge and consent of Archaeological Associates:] Defendant disagrees, and asse[r]ts it has exercised dominion and control over the metate fragments with the knowledge and acquiescence of defendant Van Horn rather than the reverse as set forth by plaintiff.

"5. [Responding to the statement that defendants did not allege any provision of law authorizing their retention of the metates.] 'Defendant disagrees.' "

Archaeological Associates' opposition also included a statement of material facts which it contended were disputed. That statement recited:

"[1.] The site where the metate fragments were taken by defendant was not a 'grave' as that term is employed in § 5097.99 of the Public Resources Code and § 7014 of the Health and Safety Code.

"[2.] The metate fragments are not 'Native American' artifacts as that term is employed in § 5097.99 of the Public Resources Code.

"[3.] The metate fragments are neither 'associated grave goods' nor 'items associated with Native American burials' as such terms are employed in § 5098.98 of the Public Resources Code.

"[4.] Defendant's possession of the metate fragments is lawful.

"[5.] The owner of the site where the metate fragments were removed does not have a genuine desire for their return."

Archaeological Associates' opposition also included a declaration by Van Horn, a declaration by Clement Meighan, professor of anthropology at UCLA, and the Commission's responses to Archaeological Associates' interrogatories.

Van Horn stated, in his declaration, that, in his opinion, the remains were those of members of Mexican Indians societies rather than local Indian tribes, because: (1) the mortuary practice of local tribes was cremation rather than burial; (2) the burial of two people in a single grave created the inference that their deaths had occurred in a single traumatic event while they were travelling together, and (3) the cranial features of one of the remains suggested that he was from Baja California.

Van Horn also stated, in the declaration, that it was his opinion that the metates were not "grave goods" because: (1) "grave goods" represented personal items buried with the deceased which were personal to the deceased and intended to accompany him in his journey in the afterlife; (2) it was rare to find any such items in a prehistoric Indian burial; (3) metates as grave goods were customarily found with female remains, because milling was done by the female members of prehistoric Indian societies; (4) such metates were customarily broken by poking holes in their centers, rather than fracturing them across their faces, as was done in the grave here, and (5) in his experience in excavating prehistoric Indian burials, grave goods were at the bottom of the burial pit and had no physical relationship to the remains.

Professor Meighan's declaration emphasized the importance of preserving prehistoric tools or artifacts, and recited that "current practice [was] to retain all artifactual specimens so that they will be available to future scholars."

In its interrogatories to the Commission, Archaeological Associates had asked the Commission to state the definition of "Native American" which the Commission used in its administration of section 5097.99 of the Public Resources Code, and to identify any authorities on which it relied for such definition. In its response, the Commission stated that it had not formally adopted a definition of "Native American"; that it had not needed such a definition in order to carry out its responsibilities under section 5097.99, and, for purposes of the current litigation, that it accepted as a definition of

"Native American" the definition Archaeological Associates had given of "Indian," namely, "'a member of any of the aboriginal peoples of the western hemisphere.'"

Archaeological Associates had also, in the interrogatories, asked the Commission to state its definition of "items associated with Native American burials" (§ 5097.98), "associated grave goods" (*ibid.*), and "artifacts" (§ 5097.99). The Commission's response to those questions was that the information was not relevant to the subject matter of the action.

After a hearing on the State's motion for summary judgment, a hearing which was not reported, the trial court granted the motion, and ordered the State to prepare a statement of facts. The State did so; Van Horn and Archaeological Associates each filed objections thereto, and the State filed replies to the objections. After a hearing on the foregoing, an order was entered granting the motion and stating the reasons therefor and denying the State's motion for sanctions. A second order was entered directing defendants to deliver the metates to the landowners or their authorized representatives.

The first order, granting the motion, recited, in relevant part: "1. The undisputed material facts establish that defendants possess Native American artifacts in violation of Public Resources Code section 5097.99.

". . . . . . . . . . . . . . . . . . . . .

"(f) Under a common-sense reading of section 5097.99, consistent with the evident purpose of the Legislature [citations], the court finds [*sic*] that the Indian grave from which the metate sections were taken constitutes a Native American grave within the meaning of 5097.99 and that the metate sections constitute Native American artifacts within the meaning of that statute."

Defendant Van Horn, as already noted, has variously asserted that he is not in possession of the metates, but that the corporate defendant has them in its possession. Without going into a rationalization to demonstrate the absurdity of such contention at this point (see *post*), it is enough to note here that the trial court's order of January 15, 1988, recited that "[d]efendant Van Horn exercised dominion and control over the metate sections by personally refusing to return them to the owners of the property from which they were taken after demand to do so, and, therefore, has sufficient possession of the artifacts for purposes of section 5099.99." Later in its order, the trial court otherwise observed that "[s]ummary judgment is appropriate against defendant Van Horn for failure to submit a statement of

undisputed material facts." (Code Civ. Proc., § 437c, subd. (b).) Because the trial court was correct in such recital and its later observation, with reference to the alleged violation of section 5097.99, we shall hereafter refer to the defendants collectively.

The second order, in regard to the metates, was stayed, and the metates were placed in custody of the director of the San Diego Museum of Man. This appeal followed.

## DISCUSSION

Defendants contend: (1) in interpreting section 5097.99, the trial court failed to consider the purpose of the entire statutory scheme; (2) the trial court overlooked triable issues of material fact; (3) sections 5097.98 and 5097.99 are unconstitutionally vague; (4) sections 5097.98 and 5097.99 deprive defendants and all archaeologists of due process and equal protection of the law, and (5) chapter 1.75 of division 5 of the Public Resources Code (§ 5097.9 et seq.) violates the establishment of religion clause of the First Amendment. For its part, the State contends: (1) defendants have no standing to bring the appeal, and (2) the appeal is frivolous, and sanctions should be awarded therefor. We address the standing issue first.

## I

## STANDING

■ The State contends that defendants have no standing to bring their purported appeal, because they are not "aggrieved" parties within the meaning of Code of Civil Procedure section 902 ("Any party aggrieved may appeal in the cases prescribed in this title. . . .") The State's standing argument is that defendants are not "aggrieved" because they have no legal possessory interest in the metates, in that they took the metates from the real property of others, and do not claim any ownership interest therein. However, as defendants recognize, *ante*, the interest which was litigated in the current action was a possessory rather than an ownership interest. Specifically: (1) in its complaint, the State alleged that defendants' continued possession of the metates was unlawful and in violation of section 5097.99; (2) section 5097.99 recites that "No person shall obtain or possess any Native American artifacts . . . which are taken from a Native American grave . . . ," and (3) in its amended answer, Archaeological Associates denied that its continued possession of the metates was unlawful, and denied that it was in violation of section 5097.99.

Further, although the trial court ruled that defendants' possession of the metates was unlawful, for the State to argue that defendants' have no

standing to challenge that ruling because they have no legal possessory interest in the metates is to beg the question, i.e., to assume the issue which is being challenged.

Finally, it ill behooves the State to attempt to abridge the remedial rights of parties whom, by suing, the State has forced to invoke such rights. Accordingly, we reject the State's standing contention and proceed to the merits of the appeal.

## II

### THE STATUTORY SCHEME

Defendants contend, by interpreting "artifacts" in section 5097.99 literally, that the trial court failed to consider the purpose of the entire statutory scheme. Hardly.

Section 5097.99 is part of chapter 1.75 ("NATIVE AMERICAN HISTORICAL, CULTURAL, AND SACRED SITES"), which was added to Division 5 ("PARKS AND MONUMENTS") of the Public Resources Code in 1976. At that time, chapter 1.75 consisted of eight sections, 5097.9 through 5097.97. Those sections concerned the establishment of the Commission, and they delineated the Commission's powers and duties with respect to places of special religious or social significance to Native Americans on public property.

In 1982: (1) language was added to subdivision (a) of section 5097.94 to extend the Commission's powers and duties to private lands; (2) subdivisions (k) and (*l* ) were added to section 5097.94 and a new section, 5097.98, was added, to extend the Commission's powers and duties to the disposition of Native American human remains and associated grave goods, and (3) another new section, 5097.99, the section under review here, was added to prohibit the obtaining or possessing of Native American artifacts or human remains taken from graves except as provided in subdivision (1) of section 5097.94 or section 5097.98.[2]

Defendants contend that section 5097.99, and specifically the word "artifacts" in that section, must be interpreted in the context of the other 1982 additions to chapter 1.75, particularly subdivisions (k) and (*l* ) of section 5097.94 and section 5097.98, and in the light of the express legislative

---

[2] The earliest state legislation requiring Indian remains to be reburied was enacted in Iowa in 1974. Currently, almost half of the states have adopted such legislation or are considering doing so, and the United States Congress is also considering such legislation. (Wolinsky, *Unburying Indian Bones: Science vs. Spirituality* (1989) 9 Am.C. Physicians Obs. 1.)

purpose of the addition. We set forth the legislative purpose and the statutes in question.

The legislative purpose of the 1982 additions is stated in a historical note following section 5097.94. The note recites:

" '(a) The Legislature finds as follows:

" '(1) Native American human burials and skeletal remains are subject to vandalism and inadvertent destruction at an increasing rate.

" '(2) State laws do not provide for the protection of these burials and remains from vandalism and destruction.

" '(3) There is no regular means at this time by which Native American descendents can make known their concerns regarding the treatment and disposition of Native American burials, skeletal remains, and items associated with Native American burials.

" '(b) The purpose of this act is:

" '(1) To provide protection to Native American human burials and skeletal remains from vandalism and inadvertent destruction.

" '(2) To provide a regular means by which Native American descendents can make known their concerns regarding the need for sensitive treatment and disposition of Native American burials, skeletal remains, and items associated with Native American burials.' "

Subdivisions (k) and (*l*) of section 5097.94 give the Commission the following additional powers and duties: "(k) To mediate, upon application of either of the parties, disputes arising between landowners and known descendents relating to the treatment and disposition of Native American human burials, skeletal remains, and items associated with Native American burials.

"The agreements shall provide protection to Native American human burials and skeletal remains from vandalism and inadvertent destruction and provide for sensitive treatment and disposition of Native American burials, skeletal remains, and associated grave goods consistent with the planned use of, or the approved project on, the land.

"(*l*) To assist interested landowners in developing agreements with appropriate Native American groups for treating or disposing, with appropriate dignity, of the human remains and any items associated with Native American burials."

Section 5097.98 recites:

"(a) Whenever the commission receives notification of a discovery of Native American human remains from a county coroner pursuant to subdivision (c) of Section 7050.5 of the Health and Safety Code, it shall immediately notify those persons it believes to be most likely descended from the deceased Native American. The descendents may, with the permission of the owner of the land, or his or her authorized representative, inspect the site of the discovery of the Native American remains and may recommend to the owner or the person responsible for the excavation work means for treating or disposing, with appropriate dignity, the human remains and any *associated grave goods.* The descendents shall complete their inspection and make their recommendation within 24 hours of their notification by the Native American Heritage Commission. The recommendation may include the scientific removal and nondestructive analysis of human remains and *items associated with Native American burials.* [Italics added.]

"(b) Whenever the commission is unable to identify a descendent, or the descendent identified fails to make a recommendation, or the landowner or his or her authorized representative rejects the recommendation of the descendent and the mediation provided for in subdivision (k) of Section 5097.94 fails to provide measures acceptable to the landowner, the landowner or his or her authorized representative shall reinter the human remains and *items associated with Native American burials* with appropriate dignity on the property in a location not subject to further subsurface disturbance. [Italics added.]

"(c) Notwithstanding the provisions of Section 5097.9, the provisions of this section, including those actions taken by the landowner or his or her authorized representative to implement this section and any action taken to implement an agreement developed pursuant to subdivision (1) of Section 5097.94, shall be exempt from the requirements of the California Environmental Quality Act (Division 13 (commencing with Section 21000)).

"(d) Notwithstanding the provisions of Section 30244, the provisions of this section, including those actions taken by the landowner or his or her authorized representative to implement this section, and any action taken to implement an agreement developed pursuant to subdivision (1) of Section 5097.94 shall be exempt from the requirements of the California Coastal Act of 1976 (Division 20 (commencing with Section 30000))."

 Defendants contend that the trial court erred in defining the metates to be "artifacts" as referred to in section 5097.99, without also defining metates to be "associated grave goods" or "items associated with Native American burials" as referred to in section 5097.98. Such latter definition is necessary, defendants argue, because only "associated grave goods" or

"items associated with Native American burials" are subject to mandatory reburial under statutory law.

Defendants misread the pertinent statutes. The mandatory reburial provisions appear in section 5097.98 and not in section 5097.99; in the case before us *defendants' possession of the metates was challenged only under section 5097.99.* Section 5097.99 in clear and unambiguous language makes it unlawful to *possess* a Native American artifact taken from a Native American grave, unless the possession is either in accordance with an agreement between the landowner and appropriate Native American groups (§ 5097.94, subd. (1)), or pursuant to a recommendation by the descendents of the deceased Native American (§ 5097.98). Thus, the possession is unlawful not because the artifacts must be reburied, but because the decision as to whether the artifacts will be reburied or preserved must be controlled by the Commission. It is this control which defendants seek to transfer from the Commission to the courts.

■ However, while we appreciate defendants' desire to preserve archaeological specimens in general, and these metates in particular, for the benefit of the public at large, the language of section 5097.99, including the references in that section to sections 5097.94 and 5097.98, clearly gives the choice of preservation or reburial to Native Americans, namely descendents of the Native American deceased or members of Native American groups, acting under the supervision of a commission which is controlled by Native Americans. As to the composition of the Commission, section 5097.92 recites that at least five, i.e., a majority, of its nine members "shall be elders, traditional people, or spiritual leaders of California Native American tribes, nominated by Native American organizations, tribes, or groups within the state." Significantly, because section 5097.92 does not refer to the ethnic or occupational status of the remaining four members of the Commission, *the obvious inference to be drawn from such omission is that the Legislature did not intend to give archaeologists any statutory powers with respect to Native American burials.*

■ In view of the foregoing, it was unnecessary for the trial court to determine whether metates are "associated grave goods" or "items associated with Native American burials," before, or in conjunction with, its defining the metates (which defendants referred to repeatedly as artifacts) to be "artifacts" within the meaning of section 5097.99.

■ Defendants contend next that section 5097.99 should not have been applied to them, because the stated purpose of the 1982 additions to chapter 1.75 was to "provide protection to Native American human burials and skeletal remains from vandalism and inadvertent destruction," whereas,

Van Horn, as an archaeologist engaged in the lawful practice of his profession, was not engaged in any such vandalism or inadvertent destruction.

However, the foregoing vandalism language was used with respect to human burials and skeletal remains, which are not at issue in the case here. Moreover, the second stated purpose of the 1982 additions to chapter 1.75, which is relevant to the case here, is to provide a regular means for Native American descendents to voice their concern about the disposition of skeletal remains *and* items associated with Native American burials, and that language does not include any references to vandalism. Accordingly, defendants' contention that section 5097.99 does not apply to them because Van Horn was not vandalizing human remains is without merit.

Defendant also argues that it is "significant" that the only mandate in the legislative purpose, directed to items associated with Native American burials, is one designed to provide Native American descendents with a means of voicing *their concerns about the disposition of such items,* and that there is no reference to any legislative intention to "bury such articles forever," or to "prohibit the scientific study of such artifacts by the professional archaeological community." However, nothing in sections 5097.94, 5097.98 or 5097.99 either mandates the burial of such artifacts or prohibits their scientific study—except at the request of the Native American descendent or at the Commission's failure to identify a descendent. Further, the reason the artifacts must be reburied if the Commission fails to identify a descendent is, as Van Horn acknowledged in a letter to his colleagues, because in cases where descendent groups were selected, virtually all such groups decided to rebury the bones and the accompanying "finds."

In view of the foregoing, we attach no significance to the Legislature's failure to include any references either to mandatory burial or scientific study in its statement of purpose, and the trial court's application of section 5097.99 to defendants was manifestly not inconsistent with the stated purpose of the statutory scheme.

## III

### TRIABLE ISSUES OF MATERIAL FACT

Defendants contend that the trial court erred in granting the State's motion for summary judgment because there were triable issues of material fact presented by the filings against the motion.

■ In reviewing the propriety of granting a motion for summary judgment, the applicable guidelines are well established and frequently stated. In *Golden West Broadcasters, Inc.* v. *Superior Court* (1981) 114 Cal.App.3d

947 [171 Cal.Rptr. 95], we said, "In approaching such a decision the trial court is guided by well settled and clearly defined rules. 'Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue.' [Citing *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 (42 Cal.Rptr. 449, 398 P.2d 785).]" (*Id.* at p. 954.)

■ In other words, as to the first requirement to be met by the moving party, only if it can be determined that the moving party's declaration, " 'considered in light of the issues raised by the pleadings . . . would, standing alone[,] support the summary judgment motion[,] does the court look to any counteraffidavits and counterdeclarations.' " (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [177 Cal.Rptr. 445], quoting from *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127 [109 Cal.Rptr. 724].)

■ Once the court has considered the filings before it and found that there are no triable issues of fact presented by such filings, determination of the motion for summary judgment then becomes a determination of an issue of law which the court must make. (*Shields* v. *County of San Diego* (1984) 155 Cal.App.3d 103, 108 [202 Cal.Rptr. 30].)

■ In short, as observed by the court in *Reid* v. *State Farm Mut. Auto Ins. Co.* (1985) 173 Cal.App.3d 557 [218 Cal.Rptr. 913], ". . . 'an issue which is abstractly one of fact may be resolved by summary judgment if the moving party's declarations fully establish the claim or defense and his opponent's declarations fail to rebut it. [Citation.] To put the matter otherwise, the issue of fact becomes one 'of law' and loses its 'triable' character if the undisputed facts leave no room for a reasonable difference of opinion." (*Id.* at pp. 570-571.)

■ Whenever a court must rule on a motion for summary judgment, the factual issue guidelines for such motion are fixed by reference solely to the pleadings.

In the case here, the factual basis for the State's action against defendants is limited indeed. It consists solely of an effort to obtain injunctive relief to redress defendants' alleged violation of section 5097.99. Such violation consists of possessing any "Native American artifacts . . . taken from a Native American grave . . . after January 1, 1984, except as otherwise provided by law or in accordance with an agreement reached pursuant to subdivision (1) of Section 5097.94 or pursuant to Section 5097.98."

In making its prima facie showing in support of the motion for summary judgment, the State, by pointing to the corporate defendant's amended answer, was able to show that it is in possession of the two metates. The State showed by means of defendants' answers to interrogatories that the metates were removed from an Indian grave. The questions thus posed are whether the metates are "artifacts" and whether an Indian is a "Native American," both within the meaning of section 5097.99.

The trial court, in ruling upon the motion, purported to make *findings* that the "Indian grave from which the metate sections were taken constitutes a Native American grave within the meaning of 5097.99 and that the metate sections constitute Native American artifacts within the meaning of that statute." The trial court misspoke itself; *findings* play no part in ruling upon a motion for summary judgment. In reality, what the trial court did was to make a *legal determination,* as a matter of statutory construction (in which we concur), that the designations *metates* and *artifacts* are interchangeable for purposes of applying section 5097.99, just as are the designations *Indian* and *Native American.*

The remainder of the State's prima facie case, with the exception of a point noted hereafter, amounted to proving a negative, namely that there is no agreement in force reached either pursuant to subdivision (1) of section 5097.94 or pursuant to section 5097.98. In its complaint, the State alleged that there are no such agreements. Defendants did not specifically deny this allegation and by implication admitted it when they alleged in their amended answer that the metates are not "within the purview of either § 5097.94 or § 5097.98 of the California Public Resources Code . . . ."

As earlier noted in our synopsis of trial court proceedings, defendant Van Horn variously insisted that he was not and had never been in possession of the metates, with the result that he himself could not have violated section 5097.99. As part of its prima facie showing, the State demonstrated that the physical retrieval and transportation of the metates had been accomplished by the defendant Van Horn.

With respect to his contention, nevertheless, that the metates were in the possession of the corporate defendant, Archaeological Associates, the State argued to the trial court, "Defendant Associates is a corporation whose board of directors comprises *two* persons, viz., David Van Horn and Ruth Van Horn. Ruth Van Horn is the president of the corporation, and David Van Horn is the vice-president and secretary. (Defendant Associates' answers to interrogatories, exhibits B and C attached hereto, interrogatory Nos. 1, 2.) If defendant Associates possesses the metates, it must obviously be with the concurrence of defendant Van Horn.

"David Van Horn has been the officer of defendant Associates who has repeatedly refused demands to return the artifacts. (See, defendant Associates' 'Memorandum in Support of Answer,' pp. 7-10.) To borrow a slogan: '*Corporations* do not possess things; *people* do.' *People* assert dominion over things, even if on behalf of their corporations.

 " 'Possession consists of actual or constructive custody of an item with knowledge of such custody and an intent to exercise dominion or control over the item directly or through other persons.' (*People* v. *Scheib* (1979) 98 Cal.App.3d 820, 828 [159 Cal.Rptr. 665]; see also, *People* v. *Estes* (1983) 147 Cal.App.3d 23, 27 [194 Cal.Rptr. 909].)

 "In view of defendant Van Horn's conduct necessitating the initiation of these proceedings, there can be little doubt that he has possession of the metates.

"Thus, the undisputed facts establish that defendants possess the metates here in issue in violation of Public Resources Code section 5097.99." (Italics in original.)

Such argument was and is precisely correct, and so in reality it was and is undisputed, as a matter of law, that it was defendant Van Horn who took and has retained possession of the metates.

Thus, with reference to the State's entire prima facie showing, as hereinabove recounted, unless defendants submitted to the trial court counterdeclarations which disputed that they were in possession of artifacts taken from a Native American grave, they would thereby fail to raise a disputed material issue of fact. Defendants submitted no such counterdeclarations; accordingly, they failed to raise any triable issues of material fact.

Instead, in an exercise of obfuscation, defendants urged that the triable issues of fact were: (1) whether the metates are "associated grave goods" or "items associated with Native American burials" and, as such, subject to the reburial provisions of section 5097.98; (2) whether the site from which defendants took the metates is a "grave" pursuant to section 5097.99 and section 7014 of the Health and Safety Code, and (3) whether defendants' possession of the artifacts is lawful because of defendants' contract with the City of Vista and the landowners' consent.

With respect to the first issue, for the reasons we have already noted, whether the metates are items defined in section 5097.98 and subject to the reburial provision of that section is wholly immaterial to whether defendants' possession of the metates is lawful under section 5097.99.

 As to the second issue, whether the site in question is a statutory "grave," defendants argue that Health and Safety Code section 7014 defines

"grave" as "a space of ground in a burial park, used, or intended to be used, for burial," whereas Van Horn stated, in his declaration, that the site in question is "characterized as a small, well developed midden (literally, a refuse heap)," i.e., not "a space of ground in a burial park." In other words, their argument goes, the possession of Native American artifacts from a prehistoric site which contains Native American remains is not covered by section 5097.99, because the site is not a historic "burial park," which is defined in section 7004 of the Health and Safety Code as a "tract of land for the burial of human remains in the ground, used or intended to be used, and dedicated, for cemetery purposes."

However, included in the general statutory scheme of division 7 of the Health and Safety Code ("DEAD BODIES"), of which sections 7014 and 7004 are a part, is section 7050.5, which concerns human remains in locations *other than a dedicated cemetery,* and requires a county coroner to notify the Commission of any such Native American remains. Accordingly, neither the Commission's duties under section 5709.98 nor, inferentially, section 5709.99, can be invoked unless the burial site is *not* a burial park, and thus defendants' contention that section 5097.99 does not apply to the metates because the metates were not taken from a "burial park" is without merit.

■ Finally, as to the third issue, neither defendants' contract with the City of Vista nor the landowners' consent is relevant to the lawfulness of defendants' possession of the metates under section 5097.99, because, under section 5097.99 and section 5097.98, neither the city nor the landowners have the right to authorize such possession; only a Native American descendent has such a right.

In view of the foregoing, defendants' contention that there were triable issues of material fact is without merit; none of the issues defendants point to are material to the unlawfulness of their possession of the metates under section 5097.99. As a consequence, the motion for summary judgment was properly granted unless there be a constitutional infirmity underlying the statute which the State sought to enforce.

IV

VAGUENESS

Attacking the statutes themselves, defendants contend that sections 5097.98 and 5097.99 are so vague that they violate the due process clause of the Fourteenth Amendment. We need not address defendants' arguments as to section 5097.98, because the State's action against defendants is framed solely in terms of section 5097.99, and not section 5097.98.

Turning to section 5097.99, defendants argue that: (1) the term "Native American" is not defined by the statute; (2) the term "grave" is not defined, and (3) the statute did not give Ibanez, the commissioner who asked Van Horn to return the artifacts to the landowner, jurisdiction to do so.

 Initially, we set forth the standard which the United States Supreme Court has established in discussing the due process requirement of legislative specificity. That standard is: "a statute which either forbids or requires the doing of an act in terms so vague that men of *common intelligence* must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126], italics added.)

 Applying the foregoing standard to defendants' argument as to "Native American," it is clear from the record that: (1) Van Horn is not a man of "common intelligence" in the field of Native American artifacts; he is an expert; (2) when he discovered the remains and artifacts, Van Horn knew that they belonged to Indians, and (3) at the time of the discovery, Van Horn knew, because the remains and the artifacts belonged to Indians, that they were governed by the statutes relating to Native Americans. This final observation is based on the following statements Van Horn made in a letter to his colleagues: "As many of you may know, current California law requires that anyone finding human remains must contact the coroner immediately. If, in the coroner's opinion, the remains are Indian, he is to contact the Native American Heritage Commission (NAHC) in Sacramento which then decides which group of local Indians should be advised of the situation. Once a group has been selected, the disposition of the remains is entirely up to them."

In view of the foregoing, defendants cannot, and do not, argue either that a person of common intelligence would not know that section 5097.99's prohibition against possession of "Native American" remains or artifacts does not apply to Indian remains or artifacts, or that Van Horn did not have such knowledge. What defendants do argue is that: (1) Van Horn did not know whether "Native American" applied to Indians who were not from the United States; (2) he believed, in the application of his professional expertise, that at least one of the skeletal remains was that of a person from Mexico, and (3) the statute does not provide either a definition of "Native American" or a provision for a determination of the question.

However, defendants did seek a determination of these questions in the trial court, when they contended, in their statement of disputed facts, that the metates were not Native American artifacts pursuant to section 5097.99. The court ruled, as a matter of law in the form of statutory

interpretation, that the metates are *Native American artifacts* within the meaning of that section. Significantly, defendants do not challenge that ruling on appeal. In other words, defendants apparently do accept the State's definition of Native American, namely an Indian from any part of the western hemisphere.

Moreover, whether "Native American" applies to Indians from any part of the western hemisphere, as the State argued, or only to Indians from the United States, as defendants argued, is not a vagueness question, or, if it is, it is not a vagueness question in relation to defendants. That is because the danger of vague laws is that they "may trap the innocent by not providing fair warning." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108-109 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294].) Here, defendants were neither "innocent" in viewing the law governing the discovery of Native American artifacts, nor were they "trap[ped]" thereby. Accordingly, their contention that the Legislature's failure to define the term renders the statute unconstitutionally vague is without merit.

■ As to the term "grave," defendants argue only that its definition in the Health and Safety Code ("burial park," see *ante*) is inapplicable to the "interment" here. However, defendants do not, and cannot credibly, contend that such inapplicability renders the word "grave" in section 5097.99 "so vague that men of common intelligence must necessarily guess at its meaning. . . ." (*Connally* v. *General Const. Co., supra*, 269 U.S. 385, 391 [70 L.Ed. 322, 328].) Moreover, Webster's Third New International Dictionary defines "grave" as "an excavation in the earth for use as a place of burial . . . a place of *interment*" (italics added), and, as noted, defendants call the site of the remains here an "interment." Accordingly, because the dictionary's recital ("common intelligence") of a definition of "grave," is the same as defendants' definition of "grave," defendants' contention that the word is vague, i.e., has no commonly acceptable meaning, is without merit.

■ Finally, defendants argue that section 5097.99 is vague because the statute does not give Ibanez, the commissioner who asked Van Horn to return the artifacts to the landowner, jurisdiction to enforce the statute. However, the statute is not being enforced by Ibanez, in that the action brought here against defendants was brought in the name of the entire Commission. Moreover, because defendants' argument relates to the enforcement rather than the wording of the statute, such argument as a matter of logic is clearly not addressed to the issue of vagueness.

In view of all the foregoing, defendants' contention that section 5097.99 is impermissibly vague, as measured by constitutional standards, is without merit.

## V

### DUE PROCESS AND EQUAL PROTECTION

#### 1. *Due Process*

 Defendants contend that sections 5097.98 and 5097.99 violate the due process clause of the Fifth and Fourteenth Amendments, because the statutes "deprive defendants and all other archaeologists practicing here of the raw material of their profession." However, defendants do not explain either: (1) what archaeologists do when they practice their profession; (2) whether, or to what extent, archaeologists need to "possess" (§ 5097.99) raw material in order to practice their profession, or (3) how, in the case here, defendants were deprived of their right to practice their profession by the State's request that they return metates which they had possessed for over a year. (The State did not allege that defendants had no right to possess the artifacts, but that defendants' "continued" possession of the artifacts at the time the complaint was filed was unlawful.)

In other words, defendants did not show, and do not argue, that archaeologists have a right to possess raw material from the property of others for an indefinite period of time. Moreover, in the trial court, defendants argued that the metates should be preserved for the benefit of the public, i.e., that the public, not defendants, had the right to their ultimate possession. More specifically, Van Horn stated in his declaration that: (1) his custom with respect to artifacts recovered during California Environmental Quality Act (CEQA) surveys was to remove the artifacts to his laboratory for cleaning, cataloging and analysis; (2) the custom of his profession was to regard the landowners as having the right to control the disposition of the artifacts, and (3) defendants and the City of Vista had agreed that the city would exhibit to the public artifacts which defendants possessed from their earlier CEQA surveys for the city.

Similarly, on appeal, defendants maintain "there is nothing . . . of personal gain involved in the position taken by Dr. Van Horn." However, the cases defendants rely on in which the constitutional right to practice a profession was raised did involve personal gain. More specifically, *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701], concerned a nontenured assistant professor who had not been rehired, and *Greene* v. *McElroy* (1959) 360 U.S. 474 [3 L.Ed.2d 1377, 79 S.Ct. 1400], concerned an engineer who had been discharged after his security clearance had been revoked. In the case here, however, defendants did not even allege that section 5097.99 or the court's order thereunder had caused them to lose any money, much less any present or future employment.

Moreover, in *Roth*, the Supreme Court held that Roth, the nontenured assistant professor, was not deprived of a liberty interest when he was "simply . . . not rehired in one job but remain[ed] as free as before to seek another" (*Board of Regents* v. *Roth, supra*, 408 U.S. 564, 575 [33 L.Ed.2d 548, 560]), and that he was not deprived of a property interest because he had "no possible claim of entitlement to re-employment . . . [but merely] an abstract concern in being rehired." (*Id.* at p. 578 [33 L.Ed.2d at p. 561].) Accordingly, in their attempt to invoke *Roth*, defendants, who did not even allege that they had lost or would lose any future work because of section 5097.99, were not deprived of either a liberty or a property right by that statute. In the absence of such deprivation, defendants' contention that the statute violates the due process clause of either the Fifth or the Fourteenth Amendments is without merit.

### 2. *Equal Protection*

 Defendants contend that sections 5097.98 and 5097.99 deprive them of equal protection of the laws under the Fourteenth Amendment. This is so, defendants argue, because the statutes discriminate in favor of members of the Indian race by treating their random, isolated remains and graveyards more favorably than those of "Spanish explorers or soldiers, padres, English sailors, prospectors, miners or pioneers of any other racial or national origin or alienage." However, as the California Supreme Court said in *Estate of Horman* (1971) 5 Cal.3d 62 [95 Cal.Rptr. 433, 485 P.2d 785], in response to an equal protection challenge: "[appellants' argument] avails [them] nothing, for the discrimination charged is not against them. To challenge the constitutionality of a statute on the ground that it is discriminatory, the party complaining must show that he is a party aggrieved or a member of the class discriminated against." (*Id.* at pp. 77-78.) In the case here, defendants do not contend that Van Horn is a descendent of a Spanish explorer, soldier or padre, or an English sailor, prospector, miner or pioneer. Accordingly, because they have not been aggrieved in the constitutional sense by sections 5097.98 and 5097.99, defendants' equal protection contention is without merit.

### VI

### The Establishment Clause

 Defendants contend that, "[v]iewed as a whole, Chapter 1.75 violates the establishment clause of the First Amendment, because it enhances the rights of Native Americans to practice their religions." In support of this contention, defendants argue that section 5097.9 prohibits the damaging of Native American religious sites, and section 5097.91 gives the

Commission powers with respect to religious sites. However, as noted, those sections were enacted in 1976, and the State's action against defendants was based on section 5097.99, which was enacted in 1982 as part of legislation designed to protect Native American skeletal remains from vandalism and to give Native American descendents an opportunity to be involved in the disposition of those remains and items associated therewith. There is no reference to religion either in section 5097.99, or in any of the other 1982 amendments. Accordingly, those amendments do not violate the establishment clause of the First Amendment.

## VII

### SANCTIONS

The State contends that it should be awarded sanctions, because defendants' appeal is frivolous. However, we cannot say that the appeal was "prosecuted for an improper motive . . . or . . . [that] it indisuptably has no merit." (*In re Marriage of Flaherty,* 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].) Accordingly, we decline to award sanctions.

### DISPOSITION

The judgment is affirmed, and the State's request for sanctions is denied.

Hollenhorst, Acting P. J., and Dabney, J., concurred.